**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **BOBBI J. MAYNE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:06-CV-288** |
| | ) | |
| **FORT WAYNE CARDIOLOGY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**OPINION AND ORDER**</u>

**I.  INTRODUCTION**

Plaintiff Bobbi Mayne, who is African-American, brings this suit against her former employer, Fort Wayne Cardiology ("FWC"), asserting that she was terminated from FWC because of racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2, 2000e-3.[1]  She further contends that FWC placed defamatory information in her FWC employment record in violation of Indiana law.

On July 19, 2007, FWC moved for summary judgment on all claims. (Docket # 14.) After being afforded an extension of time, Mayne filed a response to the motion for summary judgment on September 12, 2007, supporting her argument with her Verified Statement. (Docket # 20, 21.)  On September 20, 2007, FWC filed a reply to the motion for summary judgment, together with a motion to strike various paragraphs in Mayne's Verified Statement. (Docket # 22, 23.)  Mayne has not filed a response to the motion to strike.

Because Mayne's opposition to the motion for summary judgment relies upon evidence

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

subject to FWC's motion to strike, the Court will first turn to that motion.  For the following reasons, FWC's motion to strike will be GRANTED in part and DENIED in part, and its motion for summary judgment will be GRANTED with respect to Mayne's retaliation claim, but DENIED as to her claims of discrimination and defamation.

## II.  MOTION TO STRIKE

### A.  Applicable Law

Federal Rule of Civil Procedure 56 states that affidavits filed in support of summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).  "An affidavit not in compliance with Rule 56 can neither lend support to, nor defeat, a summary judgment motion." *Paniaguas v. Aldon Cos*., No. 2:04-cv-468-PRC, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006) (citing *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1148-49 (7th Cir. 1989); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)).

"[W]hen considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Id*.; *see also Stromsen v. Alumna Shield Indus., Inc*., No. 89-C5036, 1993 WL 34727, at *4 (N.D. Ill. Feb. 8, 1993); *Toro Co. v. Krouse, Kern & Co.*, 644 F. Supp. 986, 989 (N.D. Ind. 1986); Charles Alan Wright, et al., *Federal Practice & Procedure* § 2738 (3d ed. 2006).  Specifically, the following statements are not properly included in an affidavit and should be disregarded: (1) conclusory allegations lacking supporting evidence, *see DeLoach v. Infinity Broad.*, 164 F.3d 398, 402 (7th Cir. 1999); (2) legal

argument, *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985); (3) self-serving statements

without factual support in the record, *see Shank v. William R. Hague, Inc*., 192 F.3d 675, 682

(7th Cir. 1999); (4) inferences or opinions not "grounded in observation or other first-hand

experience," *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); and (5)

mere speculation or conjecture, *see Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999).

### B.  Discussion

As a threshold matter, Mayne's failure to respond to FWC's motion to strike exposes her

to a "summary ruling" pursuant to Local Rule 7.1(a). *See* N.D. Ind. L.R. 7.1(a) ("Failure to file a

response . . . within the time prescribed may subject the motion to summary ruling."); *Taylor v.

Lifetouch Nat'l Sch. Studios, Inc.*, 490 F. Supp. 2d 944, 950 (N.D. Ind. 2007) (granting the

defendant's motion to strike because the plaintiff failed to respond); *Hardiman v. Davita, Inc.*,

No. 2:05-CV-262-JM, 2007 WL 1395568, at *9 (N.D. Ind. May 10, 2007) (same).  Nonetheless,

the Court will proceed to examine FWC's motion on the merits.

First, FWC seeks to strike paragraphs 8, 11, 15, and 27 of Mayne's Verified Statement

because they are not based upon Mayne's personal knowledge but rather upon her "information

and belief."  Indeed, as explained *supra*, Rule 56(e) provides that affidavits "shall be made on

personal knowledge"; therefore, "[a]ffidavits based on 'information and belief' – facts that the

affiant believes are true, but which the affiant does not know are true – are not proper." *Abdullah

v. Frank*, No. 04C1181, 2007 WL 636185, at *5 (E.D.Wis. Feb. 26, 2007) (citing *Toro*, 827 F.2d

at 162-63; *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987)); *see also Weiss v.

Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000) (noting that an affidavit that stated various facts "on

information and belief" was not enough to satisfy the personal knowledge requirement).

Therefore, FWC is correct in its assertion that these statements "can be easily disposed of" (Def.'s Mot. to Strike at 4), as paragraphs 8, 11, 15, and 27 of Mayne's Verified Statement will be stricken.

FWC also seeks to strike paragraphs 16, 17, 19, 21, 25, 34, 38, and 40 of Mayne's Verified Statement, which contain general averments about the quality of work (including work speed and error rate) of Mayne's co-workers and their interaction with Mayne's supervisor, Polly Baloski.[2]  FWC contends that Mayne lacks personal knowledge of her coworkers' work quality. (Def.'s Mot. to Strike 4-5.)  However, "[c]ommon sense dictates that if an affiant is an employee of a company, she has personal knowledge of events and circumstances that occurred at the company within her sphere of observation." *Westchester Fire Ins. Co., v. Am. Wood*

---

[2] More specifically, these paragraphs state:

16.  My general work speed and work output were at least equal to, and often exceeded the work speed and work output of the two other medical coders;

17.  In July, 2004, Defendant employee Baloski singled me out for impermissibly consuming food at my work area, while not prohibiting the consumption of food by other employees;

. . . .

19.  My work did not have more errors than the work of my co-workers, and often had less;

. . . .

21.  Defendant employee Baloski placed time limits upon my work that were not placed upon the other employees in my department;

. . . .

25.  On August 4, Defendant employee Baloski provided me with a writing falsely stating that Ms. Baloski had given me a verbal warning containing the following *inter alia*, which were not required of other medical coders: I was to arrive at work promptly (although I did not have tardiness problems); I was to complete the coding of fee slips by 10 a.m.; I was to complete other tasks by times certain; I was not allowed to leave my desk until scheduled work was completed; while others received help with tasks with which the department was behind, I was to receive no help; and I was not to eat lunch at [my] desk after leaving the building for lunch break, while others were permitted to do so;

. . . .

34.  Contrary to the statements of Polly Baloski, the task of completing fee slips could not always be carried out by myself or other employees within four hours;

. . . .

38.  The other employees in my immediate department did not have the same job responsibilities as myself; [and]

39.  Other employees in my immediate department were allowed to ask for and receive assistance, while I was not[.]

*Fibers, Inc.*, No. 2:03-CV-178-TS, 2006 WL 752584, at *4 (N.D. Ind. March 21, 2006).

Indeed, it is reasonable to infer that Mayne had personal knowledge of the skills and work habits of her two co-workers, considering that the coding department consisted of only three employees and Baloski, that Mayne had seventeen years of experience in the department, and that the coding clerks assisted each other with their duties at times. (Mayne Dep. 19-21; Baloski Aff. ¶¶ 3, 10, 11, Ex. AK); *see Luna v. USAA Cas. Ins. Co.*, No. SA-05-CV-0501 OG, 2006 WL 3041472, at *5-6 (W.D. Tex. Oct. 25, 2006) (concluding that a fellow employee, who worked in the same office as the plaintiff and under the same supervisor, had personal knowledge of plaintiff's "work habits and performance relative to her own"); *Grady v. Ill. Bell Tel. Co.*, No. 94 C 3115, 1996 WL 473657, at *5 (N.D. Ill. Aug. 13, 1996) (concluding that affiant's statement about her co-worker's performance was based on personal knowledge where affiant had frequent opportunities to personally observe and evaluate her co-worker's job performance during various training sessions).

Likewise, considering the small department and seeming overlap in employee duties, it is reasonable to infer that Mayne had personal knowledge of Baloski's interaction with her co-workers.[3] *See Stanford v. Brambles USA, Inc.*, No. 98 C 1021, 1999 WL 495466, at *3 (N.D. Ill. June 30, 1999) (reasoning that plaintiff, who was a truck driver, had personal knowledge of the performance of his co-workers where the dispatcher's conversations with one driver were routinely heard by all of the other drivers over the radio).  Therefore, FWC's request to strike these paragraphs due to Mayne's purported lack of personal knowledge is unsuccessful.

---

[3] Furthermore, Mayne stated at the beginning of her Verified Statement: "I have personal knowledge of the facts contained in this Verified Statement." (Mayne V.S. ¶ 2.)

Next, FWC seeks to strike paragraphs 14, 17, 18, 20, 22, 23, and 25 because they raise assertions as to Baloski's motive or truthfulness when she took certain action with respect to Mayne.[4]  More specifically, Mayne explicitly avers in these paragraphs that Baloski "falsely stated" certain facts or that Baloski "singled [her] out" when verbally counseling her about her work performance.  However, "conjecture or speculation regarding the employer's motives cannot be used to defeat a summary judgment motion." *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998); *see also O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001) ("[S]tatements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant to an inquiry of discrimination."); *Visser*, 924 F.2d at 659-60 ("Discrimination law would be unmanageable if disgruntled employees – the friends of the plaintiff and often people in the same legal position as the plaintiff – could defeat summary judgment by affidavits speculating about the defendant's motives."); *O'Brien v. Diversified Transp., Inc.*, No. 3:04-CV-791 RM, 2006 WL 3191560, at *3 (N.D. Ind. Nov. 1, 2006) (striking affiant's opinion statements about the employer's motivations where the statements contain no explanation for the basis for his knowledge).

---

[4] More specifically, these paragraphs (that have not otherwise been set forth in footnote 2 *supra*) state:

14.  In July, 2004 Defendant employee Baloski falsely stated to me and to the Defendant's management that my work speed and work output were lower than employees with similar or identical work responsibilities;
. . . .
18.  Defendant employee Baloski singled me out as having impermissible mistakes in my work, falsely stating that I had noticeably more errors in my work than did my co-workers;
. . . .
20.  Defendant employee Baloski singled me out, falsely stating that I conducted personal business during non-break working hours;
. . . .
22.  Defendant employee Baloski singled me out, falsely stating that I was frequently away from my work area without justification; [and]
23.  Defendant employee Baloski singled me out, falsely stating that I was argumentative in my dealings with Defendant employee Baloski[.]

6

Furthermore, not only are Mayne's assertions in paragraphs 17, 18, 20, 22, and 23 that Baloski "singled her out" speculative, but they also constitute improper legal conclusions, as allegations of being "singled out" in this context are seemingly tantamount to allegations of discrimination. *See generally Smith v. Ne. Ill. Univ.*, No. 98 C 3555, 2002 WL 377725, at *3 (N.D. Ill. Feb. 28, 2002).  It is well settled that a witness is not permitted to testify to legal conclusions. *See United States v. Johnson*, 223 F.3d 665, 671 (7th Cir. 2000) ("Witnesses testify about fact, not law."); *Pfeil*, 757 F.2d at 862 ("Because legal argumentation is an expression of legal opinion and is not a recitation of a 'fact' to which an affiant is competent to testify, legal argument in an affidavit may be disregarded.").  Therefore, paragraphs 14, 17, 18, 20, 22, 23, and 25 of Mayne's Verified Statement will be stricken because they constitute improper speculation as to FWC's motive or because they articulate impermissible legal conclusions.

Finally, FWC seeks to strike paragraphs 16, 19, 21, 34, 37, and 40, arguing that they are irrelevant because they offer "nothing more than [Mayne's] own conclusory assertions about her ability."[5] (Def.'s Mot. to Strike at 2.)  More specifically, FWC asserts that these paragraphs are irrelevant, emphasizing that self-serving remarks standing alone are insufficient to create a material factual dispute on summary judgment. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996).  Nevertheless, the Court will refrain from striking these paragraphs since they reflect Mayne's "own thoughts or intentions [about her

---

[5] More specifically, these paragraphs (that have not otherwise been set forth *supra*) state:

    37.  I was not argumentative, nor insubordinate, nor hostile, nor disruptive in my dealings with supervisors or other employees; [and]
. . . .
    40.  I willingly worked with co-workers and employees, and accepted criticism when given.

performance], which are within [her] personal knowledge." *McKay v. Town & Country Cadillac, Inc.*, No. 97 C 2102, 2002 WL 531356, at *7 (N.D. Ill. Apr. 9, 2002) (emphasis omitted). Therefore, these paragraphs will survive.

### C.  Conclusion

In sum, FWC's motion to strike will be granted with respect to paragraphs 8, 11, 14, 15, 17, 18, 20, 22, 23, 25, and 27 of Mayne's Verified Statement, but denied with respect to paragraphs 16, 19, 21, 34, 37, 38, 39, and 40.  The Court will now turn to consider FWC's motion for summary judgment.

### III.  MOTION FOR SUMMARY JUDGMENT

### A.  Factual Background[6]

Mayne began working for FWC as a billing clerk in 1988. (Mayne Dep. 19-21, Ex. B.) She was promoted two years later to the position of coding clerk, which she held until her termination on November 17, 2005. (Mayne Dep. 19-21.)

From 1990 to approximately 2002, Mayne was supervised by Amy Kallenback, the supervisor of FWC's coding department at the time. (Kallenback Aff. ¶¶ 2, 3; Mayne Dep. 20.) Kallenback states that throughout the time she served as Mayne's supervisor "FWC experienced problems with [Mayne's] productivity, her work, and her general attitude." (Kallenback Aff. ¶ 5.)  In that vein, FWC describes at least six different occasions during this time period when Mayne was verbally counseled about her work performance. (*See* Def.'s Br. in Supp. of Its Mot. for Summ. J. ("Def.'s Supp. Br.") at 2-5.)

---

[6] For summary judgment purposes, the facts are recited in the light most favorable to Mayne, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Insofar as Mayne does not controvert the facts asserted by FWC in their "Statement of Material Facts," those facts "are admitted to exist without controversy" as set forth below. *See* N.D. Ind. R. 56.1.

Mayne, however, has little, if any, recollection of any dissatisfaction with her work performance on the part of FWC during this time period. (*See, e.g.*, Mayne Dep. 21-25, 30-45, 50-53, 63 "(I don't say it never happened.  I just don't recall it.").)  In fact, prior to 2004 she had never received a formal disciplinary warning that required her signature (Mayne Dep. 136), and the record reflects only "competent," "commendable," and "outstanding" scores on her annual performance reviews for 1998 through 2001, with the exception of one "adequate/marginal" score for attendance and punctuality in 1998 (Mayne Dep. Exs. L, M, N, R).[7]

Eventually, however, Kallenback claims (despite writing generally positive evaluations of Mayne) that she told FWC that Mayne was "very confrontational and very hostile," that she "could no longer put up with the fact that Mayne argued every time [she] attempted to correct her," and that she "no longer wanted to be Mayne's supervisor." (Kallenback Aff. ¶¶ 15, 16.) Shortly thereafter, FWC appointed Janelle Haire as Mayne's immediate supervisor. (Mayne Dep. 20.)

On June 1, 2004, Haire met with Mayne, stating that she had received a complaint that Mayne was starting her work at 6:45 a.m., rather than her scheduled time of 6:00 a.m., and that Mayne was passing off work to her co-workers. (Mayne Dep. 69-70, Ex. S.)  Mayne denied these allegations and wrote a letter to Haire requesting to "face [her] accuser." (Mayne Dep. 69-70, Ex. S.)

Soon thereafter, Baloski replaced Haire as the supervisor of the coding department, which consisted of Mayne and two other coders, both of whom were Caucasian. (Baloski Aff. ¶

---

[7] While Mayne received only positive scores on these annual reviews, in the section of the evaluations entitled "Specific Areas Needing Improvement," Mayne was consistently encouraged to improve in the areas of coding errors and streamlining her work. (Mayne Dep. Exs. L, M, N, R.)

3; Def's Supp. Br. 15-16; Mem. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp. Br.") 4.)  On July 26, 2004, Mayne initiated a meeting with Baloski to discuss the status of her workload. (Baloski Aff. ¶ 4; Mayne Dep. 71-76.)  During the meeting, Baloski reminded Mayne that she wanted the fee slips done at 10:00 a.m. each day, affording her four hours to code them.[8] (Mayne Dep. 71-76; Baloski Aff. ¶ 4.)  Baloski told Mayne that she planned to meet with Mayne and the temporary employee who completed her fee slips while she was on vacation to discuss ways in which Mayne could code more efficiently. (Baloski Aff. ¶ 5, Ex. A.)  Baloski also instructed Mayne to eat her lunch during her lunch hour while away from her desk and not at her desk after returning from her lunch hour. (Baloski Aff. ¶ 5; Mayne Dep. 71-72.)  In response, Mayne contended that she was just eating a "snack" at her desk, not her "lunch." (Baloski Aff. ¶ 5.)

On August 1, 2004, just days after her meeting with Baloski, Mayne wrote a letter to FWC's governing board requesting a meeting with the physicians of FWC "regarding equitable treatment." (Mayne Dep. 77, Ex. U.)  Mayne requested that Reverend Mike Nickelsen attend the meeting with her because she was receiving counseling from him and wanted him to be there for support; FWC granted Mayne's request. (Mayne Dep. 79-80, Ex. U.)

Three days after Mayne forwarded her letter to FWC's governing board, Baloski issued Mayne a verbal warning and a written verification of the verbal warning. (Mayne Dep. 80-81, Ex. V.)  The warning discussed several performance issues, including Mayne's failure to timely

---

[8] Baloski states that she also required the other medical coders in her department to complete their fee slips in four hours and that they consistently met this expectation. (Baloski Aff. ¶¶ 4, 28.)  Mayne, however, disagrees, attesting that her "general work speed and work output were at least equal to, and often exceeded the work speed and work output of the two other medical coders" and that "the task of completing fee slips could not always be carried out by [her]self and other employees within four hours[.]"). (Mayne V.S. ¶¶ 16, 34.)

code fee slips and that her lunch should be eaten during her lunch break and not after returning to the work area. (Mayne Dep. 86-87, Ex. V.)  It also explicitly stated that if these requirements were not met, Mayne would be required to work forty hours per week, 8:00 a.m. to 5:00 p.m., to coincide with the schedules of her supervisor and co-workers, rather than her current schedule of starting work at 6:00 a.m. each day and working thirty-five hours per week. (Mayne Dep. 86-87, Ex. V.)

On August 30, 2004, a meeting was held with Mayne, Reverend Nickelsen, Baloski, Nancy Shroeder, and Dr. Heger in attendance.[9] (Baloski Aff. ¶ 8; Mayne Dep. 98-99.)  During the meeting, Mayne was informed that her work speed and her output were significantly less than the two other medical coders in the department and that she had significantly more errors in her work than her co-workers. (Baloski Aff. ¶¶ 9, 28.)  In addition, Mayne was advised that her attitude about her job and her co-workers was unacceptable, disruptive, and bringing down the morale of the coding department, and that a former employee had resigned because of her attitude. (Baloski Aff. ¶¶ 13, 14; Mayne Dep. 102-03.)  At the meeting, Mayne agreed to change her schedule from thirty-five hours per week to forty hours per week to allow additional time to complete her tasks. (Baloski Aff. ¶¶ 9-12; Mayne Dep. 99-100.)

On September 29, 2004, Mayne filed a charge of discrimination against FWC with the Indiana Civil Rights Commission, alleging that she was being discriminated against because of her race. (Mayne Dep. 87, Ex. W.)  On or about October 25, 2004, the EEOC issued a Notice of Charge of Discrimination to FWC based upon the complaint filed with the Indiana Civil Rights

_____

[9] Presumably, Shroeder and Dr. Heger are in the administration at FWC, though the record does not reveal their specific titles.

Commission. (Mayne Dep. Ex. W.)

Seven months later, on April 21, 2005, Baloski issued Mayne a memo concerning certain performance issues, including coding errors. (Baloski Aff. ¶ 15, Ex. C; Mayne Dep. 103-04.) That same month, Baloski gave Mayne her annual performance review, assigning her "adequate/marginal" scores in ten areas of performance; Mayne's coding problems were also discussed. (Baloski Aff. ¶ 16, Ex. D; Mayne Dep. 106, Ex. Z.) Baloski also stated in the evaluation that Mayne worked at her own speed, still required considerable monitoring despite being employed by FWC for seventeen years, did not take the initiative in seeking out new coding rules, did not take a leadership role, was not amenable to suggestions, did not take responsibility for her mistakes, was difficult to manage, and demonstrated work habits that were below expectation. (Mayne Dep. 107-09, Ex. Z.) Mayne, however, disagreed with Baloski's criticisms and disputed each of them in writing to Baloski. (Mayne Dep. 107-09, Ex. Z.)

The next month, Baloski again reminded Mayne to adhere to her scheduled lunch hour, which she later followed up with a note. (Baloski Aff. ¶ 18; Mayne Dep. 110-12, Ex. AC.) Mayne, however, responded that she was trying to get to a certain place in her work before she stopped for lunch and asserted that she would "try" to take her lunch at the scheduled time. (Mayne Dep. 110-12, Ex. AC.)

In June 2005, Baloski sent Mayne a note about a fee that Mayne had failed to timely code, which resulted in a write-off of that charge. (Baloski Aff. ¶ 19, Ex. E; Mayne Dep. 113-14, Ex. AE.) In response, Mayne sent a "to whom it may concern" memo, essentially asserting that she was not responsible for the untimely coding. (Baloski Aff. ¶ 21, Ex. G; Mayne Dep. 113-14, Ex. AF.)

One month later, Baloski sent a note to Mayne regarding her failure to properly code certain fee slips; this prompted a discussion between Baloski and Mayne concerning why Mayne could not code them correctly. (Baloski Aff. ¶ 20; Mayne Dep. 114-16, Ex. AG.)  Ultimately, Baloski instructed Mayne not to code any more "doctor's cards." (Baloski Aff. ¶ 20; Mayne Dep. 118.)  Mayne understood that Baloski took this action because the "whole department was behind" and that it had nothing to do with her alleged error rate, although she acknowledged that she was the only coder Baloski relieved of the task. (Mayne Dep. 118-19.)

On August 1, 2005, a meeting was held with Mayne, Baloski, Martin, and Shroeder in attendance.[10]  (Baloski Aff. ¶ 22; Mayne Dep. 122-27.)  At the meeting, Baloski voiced her dissatisfaction with Mayne and Mayne's questioning of directives, which she stated was a "constant issue" ever since she became Mayne's supervisor the year before. (Baloski Aff. ¶ 22; Mayne Dep. 122-27.)  In response, Mayne challenged Baloski's criticism, though she denies FWC's allegation that she raised her voice when doing so. (Baloski ¶ 23; Mayne Dep. 125.)  In any event, as a result of the meeting, Mayne was suspended without pay for three days for insubordination and placed upon probation for ninety days. (Baloski Aff. ¶ 24, Ex. H; Mayne Dep. 125-26.)

On October 19, 2005, Baloski learned that Mayne had accumulated two days of fee slips on her desk. (Baloski Aff. ¶ 25.)  Baloski again met with Mayne to discuss how Mayne could code more efficiently. (Baloski Aff. ¶ 25, Ex. I.)  Ultimately, Baloski coded the backlog herself, a task she had not done in over two years, but nevertheless was surprised at how quickly it could

_____

[10] Again, the record does not identify Martin more specifically but assumedly he or she is a FWC administrator.

be done. (Baloski Aff. ¶ 25, Ex. I.)  Two weeks later, Baloski left Mayne a voicemail again requesting that she complete a backlog of accumulated fee slips. (Baloski Aff. ¶ 26, Ex. J.)

On November 17, 2005, another meeting was held between Mayne, Baloski, Shroeder, and Martin because Mayne's probationary period had expired earlier that month. (Mayne Dep. 131-33, Ex. AK.)  Mayne was informed that she had failed to communicate to Baloski how she was making improvements, that she was continuing to work at her own pace, that she continued to be argumentative and defensive, that she had been given every opportunity to make improvements but had failed to do so, and that any other employee at FWC would have been terminated long before this point. (Mayne Dep. 131-33, Ex. AK.)  Consequently, FWC informed Mayne that she was terminated. (Mayne Dep. 131-33, Ex. AK.)

On February 1, 2006, Mayne filed a second discrimination claim with the City of Fort Wayne Metro Human Relations Committee, and FWC received a Notice of Discrimination from the EEOC. (Mayne Dep. 134-35, Ex. AL.)  Mayne states that this second charge of discrimination was for retaliation, though at the time of her deposition, she did not know what happened to the claim for retaliatory discharge. (Mayne Dep. 134-35.)  On May 12, 2006, the EEOC issued a Dismissal and Notice of Rights letter to Mayne in response to her first discrimination claim. (Mayne Dep. 134, Ex. AN.)

**B.  Standard of Review**

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for

summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### C. Discussion

#### 1. Mayne's Race Discrimination Claim Survives

a. <u>Applicable Law</u>

A plaintiff alleging employment discrimination under Title VII can contest summary judgment by using either the direct or indirect method of proof. *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). The direct method requires the plaintiff to produce enough evidence, either direct or circumstantial, "that could permit a reasonable jury to conclude that the employer acted with discriminatory intent . . . ." *Id.*

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *id.* Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). For Title VII claims, the *prima facie* case requires four showings: (1) the plaintiff was a member of a protected class; (2) the plaintiff was meeting the employer's legitimate expectations; (3) the plaintiff suffered an adverse

employment action; and (4) similarly-situated employees who were not members of the plaintiff's protected class were treated more favorably. *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 558 (7th Cir. 2006). If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802. Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *Id.* at 804.

The focus for a pretext inquiry is "whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."). Simply put, pretext is "a deliberate falsehood." *Forrester*, 453 F.3d at 419.

"Pretext may be established directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999); *see also Forrester*, 453 F.3d at 417-18; *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 548 (7th Cir. 2002). Ultimately, the plaintiff proceeding indirectly must also "provide evidence of at least an inference that the real reason for their dismissal was discriminatory." *Jackson*, 176 F.3d at 983; *see also Brown v. Ill. Dept. of Natural Res.*, 499 F.3d 675, 683 (7th Cir. 2007).

16

However, "at summary judgment the plaintiff is not required to establish pretext *and* provide evidence of a discriminatory motive by the defendant . . . .  This level of proof is only required when a plaintiff's case is submitted to a finder of fact." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005).  Rather, in order to survive a motion for summary judgment, the plaintiff "need only produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [her] dismissal." *Id*.; *see also Forrester*, 453 F.3d at 417; *Alexander v. Wis. Dept. of Health & Family Servs.*, 264 F.3d 673, 682-83 (7th Cir. 2001); *Jackson*, 176 F.3d at 984.

b.  <u>Analysis</u>

Here, Mayne seeks to avert summary judgment under the direct method by presenting enough circumstantial evidence to compose "a convincing mosaic of discrimination against the plaintiff."[11] *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  Circumstantial evidence consists of three general types: (1) suspicious timing, ambiguous statements, or behavior toward other employees; (2) evidence that similarly situated employees were treated differently; or (3) evidence that the employee did not deserve termination and that the employer's reason for termination is a pretext for discrimination.[12] *See Volovsek v. Wis. Dep't of Agric., Trade and Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003); *Smith v. Von Maur,*

---

[11] Though Mayne also argues that she has produced direct evidence of discrimination, her contention is without merit.  Direct evidence "usually requires an admission by the decisionmaker that [her] actions were based on" the protected status – in this instance, Mayne's race. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003); *see Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (holding that direct evidence of discrimination is "evidence that establishes [discrimination] without resort to inferences from circumstantial evidence . . . ."), *cert. denied*, 537 U.S. 879 (2002).  Mayne has produced no such evidence here.

[12] The Seventh Circuit Court of Appeals has recognized that the third general type of circumstantial evidence is "substantially the same" as the evidence required in the indirect method. *Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 525 n.1 (7th Cir. 1998).

*Inc.*, No. 1:05cv393, 2006 WL 3543576, at *3 (N.D. Ind. Dec. 7, 2006).

Specifically, Mayne contends that from the evidence of record a rational juror could reasonably infer that she did not deserve termination and that Baloski's proffered reason for terminating her – her alleged poor speed, high error rate, and bad attitude – is a pretext for discrimination. (Pl.'s Resp. Br. at 3-4.)  In short, Mayne asserts that FWC's description of her as an ongoing problem employee during her entire tenure with FWC is a lie, emphasizing that for fourteen years her performance as a coding employee was more than satisfactory and that it was not until Baloski was appointed her supervisor in 2004 that she was disciplined and ultimately fired. (Pl.'s Resp. Br. at 3-4.)  More particularly, Mayne contends that Baloski "singled her out" for discipline and termination because of her race, applying restrictions to her that were not applied to her two similarly-situated Caucasian co-workers and "falsely identifying" that her work speed, error rate, and attitude were deficient. (Pl.'s Resp. Br. at 3-4.)

In support of her argument, Mayne first points to her Verified Statement, in which she essentially states, among other things, that she was meeting FWC's employment expectations. More specifically, with respect to her work speed, Mayne attests that her "general work speed and work output were at least equal to, and often exceeded the work speed and work output of the two other medical coders," acknowledging, however, that she and other employees could not always meet Baloski's expectation of completing the fee slips within four hours. (Mayne V.S. ¶¶ 16, 34.)  Mayne also states in her Verified Statement that her "work did not have more errors than the work of [her] co-workers, and often had less[.]" (Mayne V.S. ¶ 19.)  With respect to her attitude on the job, Mayne attests: "I was not argumentative, nor insubordinate, nor hostile, nor disruptive in my dealings with supervisors or other employees" and "I willingly worked with co-

18

workers and employees, and accepted criticism when given." (Mayne V.S. ¶¶ 37, 40.)

In response, FWC emphasizes, and rightly so, that generally "[a]n employee's self-serving statements about [her] ability . . . are insufficient to contradict an employer's negative assessment of that ability." *Williams v. Seniff*, 342 F.3d 774, 789-90 (7th Cir. 2003); *see also Sublett v. John Wiley & Sons, Inc*., 463 F.3d 731, 740 (7th Cir. 2006).  Nonetheless, the Seventh Circuit Court of Appeals has clarified this principle by noting explicitly that "it is not the mere self-serving nature of a nonmovant's affidavit that renders such evidence infirm.  Rather, it is the absence of personal knowledge or the failure to set forth 'specific facts' . . . that is problematic." *Williams*, 342 F.3d at 789; *see also Payne*, 337 F.3d at 772-73.  Consequently, a plaintiff may create a triable issue of fact by "specifically refuting facts that allegedly support the employer's claim of performance deficiencies." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460-61 (7th Cir. 1994) (collecting cases and stating that a "detailed refutation of events which underlie the employer's negative performance assessment demonstrates that the employer may not have honestly relied on the identified deficiencies in making its decisions"); *see also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 884 (7th Cir. 2001).

Here, Mayne does not solely rely upon her assertions in her Verified Statement to dispute FWC's proffered reason for her termination – that is, that she was not meeting their employment expectations.  Rather, the record *also* reflects that contemporaneous with her 2005 performance review, Mayne in writing specifically denied, disputed, or explained in some detail each of the ten specific areas in which Baloski claimed she had poor performance. (*See* Mayne Dep. Ex. Z.) For example, in regard to Baloski's contention that her work speed was too slow, Mayne stated: "The work items dictate how quickly a task can be completed, as well as interruptions from

coworkers who request my assistance and or calls which need to be handled immediately."
(Mayne Dep. Ex. Z.)  With respect to Baloski's assertion that her teamwork and communication
skills were very limited, Mayne responded: "I communicate regarding job related issues in a
professional manner[.]  However, [I] don't feel non job related communications is welcomed
without repercussions." (Mayne Dep. Ex. Z.)  With regard to Baloski's comment that Mayne
fails to take a leadership role as a senior employee, Mayne asserted: "It does not appear that it is
encouraged by the present supervisor . . . ." (Mayne Dep. Ex. Z.)  Likewise, as to Baloski's
criticism of Mayne's error rate, Mayne stated: "[I]f errors are made due to my following
directions then that is the reason for the error.  When errors brought to my attention are made do
[sic] to my human mistake I readily admit them and accept constructive criticism and attempt not
to make the mistake again." (Mayne Dep. Ex. Z); *see generally Johnson v. Zema Sys. Corp.*, 170
F.3d 734, 743 (7th Cir. 1999) (articulating that in contesting whether the plaintiff had met the
employer's legitimate expectations, the plaintiff "bears a burden only of producing some
evidence that [s]he was meeting [the employer's] legitimate expectations").

Significantly, in addition to Mayne's challenge to the specific facts underlying Baloski's
assessment of her skills, this is also not a case where Mayne had any substantial alteration in her
responsibilities.  Indeed, Mayne had apparently been performing the same coding tasks
competently *for more than fifteen years* by the time Baloski became her supervisor. *See Burks v.
Wis. Dept. of Transp.*, 464 F.3d 744, 753 (7th Cir. 2006) (articulating that prior performance
reviews "cannot, by themselves, demonstrate the adequacy of performance at the crucial time
when the employment action is taken . . . [but] can be relevant in certain circumstances" (citation
omitted)); *but see Fortier v. Ameritech Mobile Commc'ns., Inc.*, 161 F.3d 1106, 1113 (7th Cir.

20

1998) (same, but acknowledging that substantial alterations in the employee's responsibilities and supervision in the intervening period decrease the relevancy of such prior evaluations).

In that vein, several of the reasons that Baloski proffered for terminating Mayne, such as her alleged bad attitude and high error rate, seemingly lack the support of objective standards and thus are based solely on Baloski's subjective evaluation of Mayne's skills. *See Gordon*, 246 F.3d at 889) ("[T]he more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held." (citation omitted)); *Metty v. Motorola, Inc*., No. 05-CV-04113, 2006 WL 2916822, at *7 (N.D. Ill. Oct. 10, 2006) (noting that when the cited employment expectations that weigh negatively against the plaintiff revolve almost entirely around subjective evaluations of interpersonal skills they are subject to closer scrutiny (citing *Nellis v. Brown County*, 722 F.2d 853 (7th Cir. 1983)). Indeed, it is reasonable to infer that the only thing that changed was Mayne's supervisor, not her performance.[13] In fact, FWC does not even allege that Mayne's performance declined in the year or two before her termination; rather, FWC contends that she was an ongoing, problem employee with nagging performance problems throughout the seventeen years she worked there.

---

[13] Furthermore, in addition to disputing each of her alleged deficient performance areas, Mayne points to her two Caucasian co-workers in the coding department, each supervised by Baloski, as similarly-situated individuals who were treated more favorably. Mayne attests that Baloski "placed time limits upon [her] work that were not placed upon the other employees in [her] department" and that "[o]ther employees in [her] immediate department were allowed to ask for and receive assistance, while [she] was not." (Mayne V.S. ¶¶ 21, 39.) Furthermore, Mayne claims in her EEOC charge that one of her co-workers, "Karen," was also behind in her work but that only Mayne had her hours increased and was ultimately terminated. (Mayne Dep. Ex. W.) In addition, with respect to the June 2005 charge write-off stemming from Mayne's coding, Mayne states that "everyone in the department got things like this" (Mayne Dep. 113), but that only she was disciplined for it.

FWC disputes Mayne's contention that her two co-workers were similarly situated, emphasizing that Mayne's work speed and output were significantly less than her co-workers, that Mayne made more errors, and that Mayne had problems with her attitude. (Def.'s Supp. Br. 15-17.) FWC's challenge to Mayne's identification of similarly situated individuals, however, brings us right back to where we started. The assertion that Mayne's co-workers did not have the same performance issues is not determinative since there is an issue of fact concerning the real level of Mayne's performance. *See Metty*, 2006 WL 2916822 at *8.

Yet, in that respect, certain inconsistencies in the record submitted by FWC are puzzling and, in fact, ultimately contribute to Mayne's assertion that a material factual issue exists as to whether FWC's explanation for terminating her is credible or merely a pretext for discrimination. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) ("To show pretext, [the plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons."); *Peters*, 307 F.3d at 548 (stating that "a district court may look behind an employee's performance or disciplinary record to determine if they represent the employer's honest assessment of the employer's conduct.").

The first glaring inconsistency is the stark contrast between Kallenback's  affidavit that described Mayne as an "ongoing" problem employee and the performance reviews Kallenback drafted from 1998 through 2001 that paint a generally favorable picture of Mayne.  Specifically, Kallenback, who supervised Mayne for over twelve years, states in her affidavit: "Throughout the time that I was Mayne's supervisor, FWC experienced problems with her productivity, her work, and her general attitude[,] . . . . [which] were ongoing." (Kallenback Aff. ¶¶ 5, 6.) However, in each of Mayne's performance reviews, Kallenback assigned her above-average scores and made statements such as: "Bobbi is a knowledgeable and dependable employee."; "She willing[ly] assists co-workers when asked."; "Bobbi is an asset to this organization."; "She processes a large volume of work and if needed adjust[s] her schedule to meet the demands of

the work load."; and "Bobbi gets along well with co-workers and is nice to work with."[14] (Mayne Dep. Exs. L, M, N, R.)  Given Kallenback's ostensible change of heart, a reasonable jury could infer that Kallenback's affidavit is not genuine, but rather an effort by FWC to re-write Mayne's employment history so as to cover up Baloski's pretextual termination of Mayne. *See Grube v. Lau Indus., Inc*., 257 F.3d 723, 730 (7th Cir. 2001) ("A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." (internal quotation marks and citation omitted)).

A second seeming inconsistency is noted with respect to Baloski's affidavit.  To explain, in response to Mayne's allegation that she was "singled out" for eating lunch at her desk, Baloski states in her affidavit that "[t]he other medical coders were required to take their lunch breaks at a time certain and were not permitted to eat lunch at their work station." (Baloski Aff. ¶ 19.) However, Baloski's note to Mayne's personnel file contemporaneous with the incident states: "I asked [Mayne] to eat her lunch on her lunch hour, [and] not at her desk and when she returns, [and] she wants this to be done department wide, not just her." (Baloski Aff. Ex. A.)  While Baloski may indeed have later made this a department-wide policy as a result of Mayne's request, it appears that at least initially, Mayne was, contrary to FWC's assertion, singled out for this treatment. *See generally Gustovich v. AT&T Commc'ns., Inc*., 972 F.2d 845, 848 (7th Cir. 1992) (stating that in a pretext analysis the question is not whether the employer's reasons for a decision are right, but whether the employer's description of its reason is honest).

In short, a rational juror could indeed reasonably infer that the rather abrupt shift in

---

[14] To be fair, these evaluations also identified areas in which Mayne could improve her performance and encouraged her to "continue to think of ways to stream line work" and "to continue to catch coding errors." (*See* Mayne Dep. Exs. M, N, R.)  Yet, apparently these comments did not reflect deficiencies serious enough to warrant a score lower than "competent/solid" in any particular area, much less rise to a level warranting discipline.

23

Mayne's performance indicators under Baloski was simply the result of Baloski's honest belief that Mayne was a poor performer, despite all of the positive reviews previously given by Kallenback.  However, taking the evidence in the light most favorable to Mayne, a rational juror could *also* reasonably infer that the abrupt shift was as a "reflection of [Baloski's] explicit desire to be rid of [Mayne] rather than providing proof of [her] occupational failings." *Metty*, 2006 WL 2916822, at *7; *see Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 512 (7th Cir. 1998) (acknowledging that there are situations when "the negative performance assessment is itself suspect because the evaluation may have been the product of bias rather than objectively verifiable information"); *see also Williams v. Pharmacia, Inc.*, 956 F. Supp. 1457, 1462 (N.D. Ind. 1996) (concluding that a reasonable jury could conclude that the plaintiff was subject to closer scrutiny by her supervisor, given goals that she could not have been expected to meet, and then terminated when she predictably failed to meet those goals).

Furthermore, the record reflects that ostensibly Baloski was the sole decision maker in Mayne's termination.  Though several FWC administrators were present with Baloski at several meetings with Mayne, the record does not suggest that any of them contributed to Baloski's decision to terminate Mayne or, for that matter, possessed any information about Mayne's performance other than what Baloski supplied to them. *See generally Dey*, 28 F.3d at 1459 (collecting cases and stating that summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action); *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir. 1993) (concluding that reasonable jurors could conclude that a supervisor intent upon purging the workforce of older employees lied to his superiors about the quality of

the plaintiff's job performance).

The Seventh Circuit has pointed out on a number of occasions "that because employment discrimination cases often turn on questions of intent and credibility, courts in these cases must take care as they weigh summary judgment motions not to invade the province of the factfinder by attempting to resolve swearing contests and the like." *Giannopoulos v. Brach & Brock Confections, Inc*., 109 F.3d 406, 410 (7th Cir. 1997); *see also Tuszkiewicz v. Allen-Bradley Co., Inc*., 967 F. Supp. 1119, 1127 (E.D. Wis. 1997) ("The court must . . . be careful not to step in the shoes of the factfinder by resolving swearing matches.").  Here, though admittedly it is a close call, the evidence of record when considered in the light most favorable to Mayne would permit a rational finder of fact to infer that Baloski fabricated the reason for Mayne's dismissal. *See Dey*, 28 F.3d at 1461.  That is all Mayne must show to avoid summary judgment. *See Rudin*, 420 F.3d at 726 ("[I]f there is a question of fact as to the believability of an employer's purported reasons for an employment decision then, even if the evidence presented by [the plaintiff] does not compel the conclusion that [her employer] discriminated against [her] when making its . . . decision, at a bare minimum it suffices to defeat [the employer's] summary judgment motion.); *Anderson v. Baxter Healthcare Corp*., 13 F.3d 1120, 1124 (7th Cir. 1994) (stating "that if the inference of improper motive *can* be drawn, there must be a trial (emphasis in original)).

Consequently, FWC's motion for summary judgment with respect to Mayne's racial discrimination claim will be denied.

### 2.  Mayne's Retaliation Claim Fails

Like discrimination claims, a plaintiff alleging retaliation under Title VII can contest

summary judgment by using either the direct or indirect method of proof.[15] *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 375 (7th Cir. 2007) (citing *Stone*, 281 F.3d at 644).  Here, Mayne argues her claim solely under the direct method.

Under the direct method, a plaintiff can defeat summary judgment by presenting either direct or circumstantial evidence demonstrating that she engaged in protected activity "and as a result suffered the adverse employment action of which [s]he complains . . ." *Sylvester v. SOS Children's Vills. Ill. Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (emphasis in original omitted). Stated another way, a plaintiff proceeding under the direct method must prove that she "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that a causal connection exists between the two." *Tomanovich*, 457 F.3d at 663; *see also Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848 (7th Cir. 2007).

Here, Mayne complained of "inequitable treatment" to the governing board of FWC on August 1, 2004, and she filed her first charge of discrimination with the EEOC on September 29, 2004.  Therefore, Mayne has demonstrated that she participated in a protected activity, thus satisfying the first element of her retaliation claim. *See Pantoja*, 495 F.3d at 848.

As to the second element, neither party disputes that Mayne's termination on November 17, 2005, constitutes an adverse employment action. *See Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996).  Likewise, though Mayne does not address this issue, her three-day suspension

---

[15] Under the indirect method, retaliation claims, like other discrimination claims, follow the *McDonnell Douglas* model as clarified by the Seventh Circuit in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 641, 644 (7th Cir. 2002).  First, the plaintiff must establish a *prima facie* case by showing that she (1) engaged in statutorily protected activity; (2) met the employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006); *see also Stone*, 281 F.3d at 644.  If this case is made, the defendant must proffer a legitimate, non-invidious reason for the adverse employment action. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004). The burden then falls on the plaintiff to show that the proffered reason is pretextual. *Id.*

on August 1, 2005, constitutes an adverse employment action. *Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (holding that a three-day suspension without pay is an adverse employment action).  In contrast, the disciplinary warning and change of her schedule that occurred in August 2004 do not rise to the level of an adverse employment action under Seventh Circuit case law. *See Grube*, 257 F.3d at 729 (stating that altered work hours, unfair reprimands, or negative performance evaluations, when unaccompanied by some tangible job consequence, do not constitute adverse employment actions); *see generally Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

Mayne stumbles when attempting to establish the third element – that her suspension or termination was causally linked to her complaints of discrimination.  "In order to establish a causal link between protected activity and an adverse employment action, a plaintiff must demonstrate that the employer would not have taken the alleged adverse action 'but for' the plaintiff's protected activity." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002) (citation omitted).  Here, Mayne has failed to point to any evidence to support her argument that FWC would not have suspended or terminated her "but for" her complaints of discrimination.

Nor can Mayne establish the causal link requirement by showing that a suspiciously short period of time passed between her complaint and her suspension or termination. *See Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (stating that a causal link "is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action").  An eleven-month link, which is the

27

shortest span of time between Mayne's most recent complaint of discrimination during her employment and her first adverse employment action, is not sufficient to establish a causal link. *See, e.g.*, *Sauzek v. Exxon Coal USA, Inc*., 202 F.3d 913, 918 (7th Cir. 2000) (stating that a three-month delay between a protected activity and an adverse employment action is insufficient to establish causation); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (holding that four months negates causal inference); *Davidson*, 133 F.3d at 511 (stating that as the time period between the protected activity and the adverse employment action increases, the hint of a causal link decreases).

Because Mayne has failed to establish her retaliation claim under the direct method, she must rely on the burden-shifting framework of the indirect method.  However, Mayne did not even attempt to argue in her response brief that she could establish a retaliation claim under *McDonnell Douglas*.  Therefore, that argument is deemed abandoned. *See Laborers' Int'l Union of North Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions." (citation omitted)); *Arendt v. Vetta Sports, Inc*., 99 F.3d 231, 237 (7th Cir. 1996) (collecting cases).

In sum, Mayne cannot establish her claim of retaliation under the direct method of proof, and she has abandoned any argument that she could establish it under the indirect method. Therefore, FWC's motion for summary judgment will be granted with respect to Mayne's retaliation claim.

### 3.  Mayne's State Law Defamation Claim Survives

In her state law defamation claim, Mayne contends that FWC placed false and

defamatory information in her employment record that will subject her "to ridicule, scorn or contempt in a considerable part of the relevant community" and that will "severely harm [her] professional and employment reputation." (Compl. ¶¶ 33-37.)  FWC contends, however, that any statements made by FWC were privileged, and thus it moves for judgment as a matter of law on Mayne's defamation claim.

The elements of a defamation claim are (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Kelley v. Tanoos*, 865 N.E.2d 593, 597 (Ind. 2007).  However, even if these elements are established, Indiana courts have recognized a common interest privilege that protects communication made in connection with membership qualifications, employment references, intracompany communications, and the extension of credit. *Id*. (citations omitted); *see also Schrader v. Eli Lilly & Co*, 639 N.E.2d 258, 262 (Ind. 1994).  This privilege "is intended to facilitate full and unrestricted communication on matters in which the parties have a common interest or duty." *Kelley*, 865 N.E.2d at 598 (internal quotation marks and citation omitted).

"A statement otherwise protected by the doctrine of qualified privilege may lose its privileged character upon a showing of abuse wherein: (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth." *Schrader*, 639 N.E.2d at 262. "Once the communication is established as qualifiedly privileged, the plaintiff then has the burden of overcoming that privilege by showing that it has been abused." *Id*.

Here, neither party in its brief addresses Mayne's ability to establish the elements of the

defamation claim; thus, apparently FWC concedes for purposes of summary judgment that Mayne could establish the four elements.  Instead, FWC emphasizes, and correctly so, that the statements made by FWC of which Mayne complains were made within FWC to evaluate the fitness of Mayne as an employee and thus are subject to the qualified privilege for intracompany communications. *See Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (7th Cir. 1992) ("Intracompany communications regarding the fitness of an employee are protected by the qualified privilege."). Consequently, in order to avoid summary judgment, Mayne bears the burden of demonstrating that the statements were motivated by ill will, that there was excessive publication of the information, or that the statements were made without belief or grounds for belief.

Mayne has produced no evidence that demonstrates the statements were excessively published within FWC.  In fact, Mayne does not even attempt to rebut FWC's testimony that it treats each employee's personnel file as confidential and that such files are not available to the public or every employee within FWC. (*See* Shroeder Aff. ¶ 4.)

However, for the reasons articulated *supra* in the context of Mayne's discrimination claim, Mayne *has* raised a material issue of fact with respect to whether Baloski's statements about Mayne's poor performance were pretextual, that is "a deliberate falsehood." *Forrester*, 453 F.3d at 419.  For those same reasons articulated *supra*, we conclude at this juncture that a material issue of fact exists with respect to whether Baloski made such statements in Mayne's personnel file "without belief or grounds for belief in its truth." *Schrader*, 639 N.E.2d at 262. Therefore, FWC's motion for summary judgment as to Mayne's defamation claim will be denied.

## IV.  CONCLUSION

For the foregoing reasons, the Defendants' motion to strike (Docket # 23) is GRANTED with respect to paragraphs 8, 11, 14, 15, 17, 18, 20, 22, 23, 25, and 27 of Mayne's Verified Statement, but DENIED with respect to paragraphs 16, 19, 21, 34, 37, 38, 39, and 40. Defendant's motion for summary judgment (Docket # 14) is GRANTED with respect to the Plaintiff's retaliation claim, but is DENIED as to Plaintiff's discrimination and defamation claims.

SO ORDERED.

Enter for November 2, 2007.

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge

31